**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**TEXARKANA DIVISION**

**MARY TURNER, ET AL**                                          **PLAINTIFFS**

**v.**                              **CASE NO. 4:92-cv-4040**

**LEWISVILLE SCHOOL DISTRICT NO. 1**                **DEFENDANTS**

**BRIEF IN SUPPORT OF MOTION FOR DECLARATORY JUDGMENT, OR**
**ALTERNATIVELY, FOR CLARIFICATION OF PREVIOUS ORDERS, OR**
**ALTERNATIVELY, FOR MODIFICATION OF PREVIOUS ORDERS**

**INTRODUCTION**

As evidenced by the changes in the school choice laws' exemption and conflict provisions since 2013 and the corresponding decrease in the number of districts qualifying for total exemption – from 23 districts in 2013-14 to six for 2018-19[1] – the Arkansas General Assembly clearly intends to amend the school choice laws until they have reduced the number of districts not participating in school choice to zero, whether or not the provisions of the school choice laws are constitutional.

---

[1]     For the 2018-19 school year, the ADE has fully exempted only six districts: Cutter Morning Star School District, El Dorado School District, Hot Springs School District, Jacksonville North-Pulaski School District, Lake Hamilton School District, and Mountain Pine School District. Of these six, four are parties to the same case: Cutter Morning Star, Hot Springs, Lake Hamilton, and Mountain Pine are four of the seven defendants in the Garland County desegregation case. (The other three districts in Garland County are Jessieville, Lakeside, and Fountain Lake. They are identically situated to the other four but did not seek an exemption.) All six of the districts granted an exemption by ADE have relatively recent court orders arising from a challenge to an older consent desegregation order. This reflects the fact that the 2017 Act is being applied by the ADE even more narrowly than it is written. A seventh district, Camden Fairview School District ("CFSD"), received a partial exemption prohibiting transfers between it and one other school district but requiring participation in school choice by CFSD as to all other districts.

Just as a person is held to have intended all of the natural and probable consequences of his intentional conduct, so is the State of Arkansas. When a person intentionally but aimlessly fires a pistol into a crowd, that person will be held to have intentionally shot whomever the bullet hits. At present, the State **intends** to have free and unrestricted movement of students between districts by promoting the Public School Choice Act of 2015, as amended by the 2017 Act. Put simply, the State, through the General Assembly, the Arkansas Department of Education ("ADE"), and the State Board of Education ("SBE"), is trying to recreate a 1960s vintage "freedom of choice" system, whether it is constitutional or not.

There are areas of Arkansas where racially identifiable "black" districts exist side-by-side with racially identifiable "white" districts. The southwest portion of Arkansas, including Lafayette, Hempstead, and Columbia counties, is such an area. Lafayette County School District ("LCSD") is a majority black school district bordered by districts with very few, if any, black students.[2] It is a fact that a natural and probable consequence of school choice between a "blacker" district and an adjoining "whiter" district is racial segregation of the two districts. *Columbus Bd. Educ. v. Penick*, 443 U.S. 449, 464 (1979) ("actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose."). Therefore, if the State promotes school choice in such

---

[2]     LCSD's 2017-18 enrollment by race is 61.1% black, 38.9% non-black. Spring Hill School District's ("Spring Hill") 2017-18 enrollment by race is 1.0% black, 99.0% non-black. Emerson-Taylor-Bradley School District's ("ETBSD") 2017-18 enrollment by race is 16.1% black and 83.9% non-black. The Taylor schools, the primary destination for school choice applicants to ETBSD, have only 3.7% black student enrollment. Lafayette County High School is located approximately 25 miles from Spring Hill High School, 30 miles from Emerson High School, 30 miles from Taylor High School, and 25 miles from Bradley High School.

a situation, it will be held to have intended the resulting racial segregation. Likewise, if LCSD agrees to participate in school choice, it will be held to have intended the resulting racial segregation. *See Kemp v. Beasley*, No. 1:89-cv-1111, U.S. Dist. Ct., W.D. Ark., El Dorado Div.

LCSD believes participation in school choice violates its desegregation obligation to avoid "engaging in any policies, practices, customs or usages of racial discrimination in any school operation including, but not limited to . . . student assignments, and the treatment of black and other minority pupils within the school system." (*See* Exhibit 1,[3] 1993 *Turner* Decree, ¶ 4). Additionally, the 1993 *Turner* Decree requires the district to implement a desegregation and integration policy "which promotes pupil . . . integration rather than one of passive acceptance of desegregation between students of all races without regard to socio-economic status." (*See* Exhibit 1, 1993 *Turner* Decree, ¶ 12). The ADE and the SBE have ordered LCSD to participate in school choice for the 2018-19 school year. (*See* Exhibit 16, the SBE's March 28, 2018 Order). The State's refusal to grant LCSD an exemption from participation in school choice ignores the problem of inter-district white flight out of LCSD. The primary white flight destination school districts out of LCSD are Spring Hill School District ("Spring Hill") and Emerson-Taylor-Bradley School District ("ETBSD"). Participation in school choice by LCSD will have a segregative impact in LCSD and Lafayette, Hempstead, and Columbia counties. Therefore, relief from this Court is necessary.

---

[3]     All references in this brief to exhibits are to the documents numbered 1-27 and attached to the motion that was filed in conjunction with this supporting brief.

## ARGUMENT

This Court "retains ancillary jurisdiction to manage its proceedings, vindicate its authority, and effectuate the decrees." *Jenkins v. Kansas City Missouri School District*, 516 F.3d 1074, 1081 (8th Cir. 2008); *see also*, *Gardiner v. A. H. Robins Company, Inc.*, 747 F.2d 1180, 1190 n. 13 (8th Cir. 1984) ("the district court retains the inherent power to enforce settlement agreements entered into in settlement of litigation pending before it."). LCSD requests that the Court consider relief in the form of a declaratory judgment, clarification of previous orders, or modification of previous orders. "[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. A declaratory judgment is appropriate when it will "dispose of the controversy, thus serving a useful and practical purpose." *Allstate Ins. Co. v. Thompson*, 121 F. Supp. 696, 701 (W.D. Ark. 1954). Alternatively, Article III courts have consistently found requests for clarification of the terms of their orders and decrees both appropriate and justiciable. *See, e.g., Little Rock School District v. Pulaski County Special School District No. 1*, 769 F. Supp. 1491, 1492 (E.D. Ark. 1991). As an additional alternative, modification of the 1993 *Turner* Decree (*see* Exhibit 1) to reflect the significant change in the law effected by the repeal of the 1989 Act is also an appropriate course of action. Modification of a consent decree is appropriate "when enforcement of the decree without modification would be detrimental to the public interest." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992); *see also*, *Horne v. Flores*, 557 U.S. 433, 447 (2009).

The 1989 Act, a school choice program that allowed inter-district transfers without consent of the resident district as long as the movement was integrative, was in effect when the 1993 *Turner* Decree was entered. (*See* Exhibit 2, the 1989 Act). The 1989 Act prohibited segregative transfers of both non-black and black students. A white child could not transfer to a district that was "whiter" than the one in which he resided, nor a black child to a "blacker" district. LCSD contends that modification is warranted following the 2013 repeal of the 1989 Act because it is detrimental to the public interest to allow an inter-district student transfer program to create segregation or further the racial divide between school districts to the extent that one school district is comprised of a substantial number of black students while neighboring districts have virtually no black students.

Allowing movement between schools and districts is a policy choice the State is arguably entitled to make. What it cannot do is ignore the fundamental constitutional principle that "'[i]t is axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.'" *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quoting *Lee v. Macon County Board of Education*, 267 F. Supp. 458, 475-76 (M.D. Ala. 1967)). The recent actions of the SBE and the ADE confront LCSD with the very real prospect that it will be forced to become a "'passive participant' in a system of racial exclusion practiced by [private parties]." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989). The fact that such private choices may reflect the best of intentions – for example, a claim that a choice transfer is in the best interests of the child – is irrelevant. "[G]ood intentions as to one valid objective do not serve to negate the State's involvement in violation of a constitutional duty. . . . The Equal Protection Clause would be a sterile promise if state involvement in possible private activity could be

shielded altogether from constitutional scrutiny simply because its ultimate end was not discrimination but some higher goal." *Id.* at 455-67. Put simply, the State cannot authorize segregative transfers and excuse that result based on the allegedly unbiased "desires of the parent."

LCSD hereby proposes the following alternative avenues for the Court to consider and determine which is best to effectuate and enforce the 1993 *Turner* Decree: (1) declare portions of the 2017 Act unconstitutional and void the SBE's March 28, 2018 Order requiring LCSD to participate in school choice; (2) declare that LCSD has a conflict with participating in school choice under the 2015 Act as amended by the 2017 Act due to the orders entered in *Turner* and the segregative impact participation in school choice would have and void the SBE's March 28, 2018 Order requiring LCSD to participate in school choice; (3) clarify the previous orders entered in *Turner* to reflect that LCSD has a conflict with participating in school choice under the 2015 Act as amended by the 2017 Act, that segregative inter-district transfers are prohibited unless requested for educational or compassionate purposes and approved by LCSD's board, and that the effect of this clarification is to void the SBE's March 28, 2018 Order requiring LCSD to participate in school choice; and/or (4) modify the orders previously entered in *Turner* to reflect the repeal of the 1989 Act and LCSD's conflict with participating in school choice under the 2015 Act as amended by the 2017 Act and void the SBE's March 28, 2018 Order requiring LCSD to participate in school choice.

## I.    The 1993 Turner Decree Applies to LCSD, and Declaratory Relief Confirming that Application is Appropriate

LCSD is the successor district to Lewisville School District, the original defendant in this litigation. LCSD is the product of the former Lewisville School District

("Lewisville") and Stamps School District ("Stamps"), which were consolidated into a single district effective July 1, 2003. LCSD was substituted for Lewisville as the defendant in this lawsuit by order of this Court entered November 23, 2015. *See* Doc. 26, pp. 1-2.

In 2015, when LCSD requested substitution in this case, it did not specifically ask this Court whether or not the 1993 *Turner* Decree applied to the consolidated district. The Court granted LCSD's motion to substitute but declined to rule on the applicability of the 1993 *Turner* Decree to LCSD, noting that issue had not been briefed. *See* Doc. 26, p. 2. LCSD now asks this Court to specifically determine that the 1993 *Turner* Decree is applicable to LCSD, as the successor district to Lewisville.

The consolidation, annexation, and formation of school districts are governed by state statute. Ark. Code Ann. § 6-13-1401 et seq. Consolidation is defined as "the joining of two (2) or more school districts or parts thereof to create a new single school district." Ark. Code Ann. § 6-13-1401(4). A "resulting district" is defined as "the new school district created from . . . districts as a result of consolidation." Ark. Code Ann. § 6-13-1401(6). In compliance with the requirements for voluntary consolidation outlined in Ark. Code Ann. § 6-13-1404(a)(2), Lewisville and Stamps filed a petition requesting consolidation with the SBE and the proposed consolidation was approved by a vote of the qualified electors of both districts at the September 2002 annual school election. *See* Doc. 24, ¶ 2.

The consolidation was approved by the SBE at its February 10, 2003 meeting. *See* Doc. 24, ¶ 3 and Doc. 24-1, SBE Agenda and Minutes, pp. 10-11; *see also*, Exhibit 25, Consolidation Order. The minutes also reflect that "the Attorney General had stated that the merger would not be viewed as negatively impacting desegregation efforts." *See* Doc. 24-1, SBE Agenda and Minutes, p. 10-11. Once the SBE has approved a petition requesting

voluntary consolidation, the statutory process requires the SBE to "issue an order dissolving the affected school districts and establishing the resulting school district or districts." Ark. Code Ann. § 6-13-1404(d). The 2003 Consolidation Order states that "the Lewisville and Stamps School Districts are hereby dissolved and the Lafayette County School District is hereby established." (*See* Exhibit 25, p. 1, ¶ 2). The Consolidation Order further states that effective July 1, 2003, "all legally valid assets and liabilities of the Lewisville and Stamps School Districts, including both real and personal property, shall be transferred to and/or assigned to the Lafayette County School District." (*See* Exhibit 25, p. 2, ¶ 8).

LCSD contends that the 1993 *Turner* Decree must be applied to it because, by virtue of the SBE's order dissolving the former Lewisville School District, Lewisville has ceased to exist as a legal entity. Additionally, Ark. Code Ann. § 6-13-1407, regarding "resulting district[s] created," states that the resulting district shall become the "successor in interest to the property of the school district dissolved, shall become liable for the contracts and debts of such a school district, and may sue and be sued therefor." A consent decree is both a legal settlement and a type of contract. *See Firefighters v. City of Cleveland*, 478 U.S. 501, 519 (1986) ("because their terms are arrived at through mutual agreement of the parties, consent decrees . . . closely resemble contracts"). LCSD, as the successor in interest to the school district dissolved, is liable for Lewisville's performance of the 1993 *Turner* Decree. Finally, LCSD is now the sole entity responsible for (or capable of) performing the obligations of the defendant under the 1993 *Turner* Decree. LCSD is also the sole entity responsible for educating black student plaintiffs and employing black staff plaintiffs.

When Jacksonville-North Pulaski School District ("JNPSD") was formed by detaching territory from Pulaski County Special School District ("PCSSD"), the Honorable D. Price Marshall, federal judge presiding in PCSSD's desegregation case, agreed that JNPSD inherited the desegregation status of its parent district, PCSSD. (*See* Exhibit 26, Transcript of August 14, 2014 Status Conference in *LRSD v. PCSSD*, No. 4:82-cv-866, U.S. Dist. Ct., E.D. Ark., Western Div., p. 33 (The Court: "I think the primary issue for the Court to deal with is something that's undisputed, it's a background principle in all of this, and that is that, as you just said, of course, the county district is still a party and any new district would be a party and subject to the ongoing work to achieve unitary status under the remaining parts of Plan 2000."); *id.* (Mr. Roberts: "[I]t's been the position of PCSSD with everyone from the commissioner, the State Board, the State Department, and all the individuals in Jacksonville, that the unitary status status of PCSSD will be the unitary status status of the new district ab initio.")). In other words, JNPSD, a brand new school district, remained subject to the desegregation orders and obligations of PCSSD because it was created from the territory of PCSSD and was now tasked with educating students who belonged to the desegregation case's class of black student plaintiffs. There is no reason to believe LCSD should not be subject to Lewisville's obligations exactly as JNPSD was to PCSSD's.

## II. Portions of the 2017 Act are Unconstitutional Usurpations of Judicial Authority, and Declaratory Relief is Appropriate

The offensive provision of the 2017 Act is that which authorizes the ADE to evaluate LCSD's desegregation orders and determine whether or not a conflict exists between them and participation in school choice. *See* Ark. Code Ann. § 6-18-1906(a). This provision was clearly included by the General Assembly in an attempt to make the ADE,

not the federal court where the case was pending, the decision maker regarding a district's participation in choice. As such, the 2017 Act is unconstitutional under the teaching of *Cooper v. Aaron*, 358 U.S. 1 (1958). The federal court with jurisdiction of the desegregation case, not the ADE or the SBE, is the proper entity to evaluate whether or not LCSD has a conflict with participating in school choice.[4] The legislature's attempt to grant powers to the ADE to determine whether or not a district has a conflict with participating in school choice is unconstitutional because it usurps the judicial authority of Article III courts in favor of the ADE and the SBE, which are executive entities.

It is a fundamental axiom of our federal system that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Federal court orders and decrees are not simply advice dispensed as the courts see fit. They are embodiments of the Supreme Law of the Land. "Federal courts are not reduced to approving consent decrees and hoping for compliance.

---

[4]      Indeed, the SBE (as it was constituted from *circa* July 2013 to June 2016) has previously acknowledged the impropriety of an entity such as itself engaging in the interpretation of federal court orders, noting in its own orders that "[i]t is not this Board's role to determine the validity or invalidity of a desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation." (*See*, for example, SBE orders denying school choice transfers:

June 9, 2016 JNPSD – Bopp Order, ¶ 8, available at:
http://www.arkansased.gov/public/userfiles/Legal/State_Board_Orders/2016_Orders/ORDER_School_Choice_Appeal_Bopp_Family.pdf;

August 6, 2015 Lafayette County – Teague Order, ¶ 7, available at:
http://www.arkansased.gov/public/userfiles/Legal/State_Board_Orders/August_6_2015_Orders/ORDER_School_Choice_Appeal_Teague_Family.pdf

August 14, 2014 Forrest City – Goodall Order, ¶ 8, available at:
http://www.arkansased.gov/public/userfiles/Legal/State_Board_Orders/August_14_2014_Orders/Goodall_School_Choice_Order.pdf

August 12, 2013 Forrest City – Aldridge Order, ¶ 7, available at:
http://www.arkansased.gov/public/userfiles/Legal/State_Board_Orders/August%2012%20Orders/Aldridge%20ORDER%20090913.pdf

Once entered, a consent decree may be enforced." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004). Indeed, the Supreme Court has declared that a district court has the power to enforce its decrees precisely because that "vindicates an agreement that the state officials reached to comply with federal law." *Frew*, 540 U.S. at 439. A consent decree, the Court observed, "is a federal-court order that springs from a federal dispute and furthers the objectives of federal law." *Id*. at 438 (citing *Firefighters*, 478 U.S. at 525). Speaking directly to the question of which governmental entity – state or federal – was the proper arbiter of federal court desegregation orders, Honorable D. Price Marshall stated unequivocally that it must be the federal court, to the exclusion of state courts or agencies. *See* Exhibit 27, Transcript of August 8, 2016 hearing in *Little Rock School District v. Pulaski County Special School District*, No. 4:82-cv-866, p. 86 (granting JNPSD's motion to enforce settlement agreement and thereby allowing JNPSD to exempt itself from participating in school choice); *id*., p. 88 (finding "untenable" the notion that "the State Board might have the final word on the decree in some disputes and that this Court might in some disputes and that the state court might in some disputes" and noting "the potential – if you've got three cooks in the kitchen . . . the potential for them to be elbowing each other and having a conflicting view about what's on the stove and what goes in and what comes off and all of that is just too great.").

In 1956, the people of Arkansas decided to rely on their votes, along with the legislative and executive branches of state government, to rescue them from certain unpopular provisions of the federal constitution. They approved Amendment 44 by popular vote. That measure exhorted all actors to "take appropriate action and pass laws opposing in every Constitutional manner the Un-Constitutional desegregation decisions of May 17,

1954 and May 31, 1955 of the United States Supreme Court." ARK. CONST., AMEND. 44.[5]
Amendment 44 urged Arkansas officials to pursue the "nullification" of what it
characterized as "dangerous encroachments": *Brown v. Board of Education*, 347 U.S. 483
(1954) (*Brown I*) and *Brown v. Board of Education*, 349 U.S. 294 (1955) (*Brown II*). These
governmental actions, popular though they were, led directly to the disaster that was the
1957 Little Rock Central High School crisis.

The response of the United States Supreme Court could not have been clearer. In
no uncertain terms, the Supreme Court ruled that state officials cannot usurp the authority
of an Article III Court. *See Cooper*, 358 U.S. at 4 (There is a "duty on state officials to
obey federal court orders resting on [a federal court's] considered interpretation of the
United States Constitution."); *id.* at 19 (State officials may not act in ways that "nullify a
federal court order."). As noted at the inception of the Court's opinion in *Cooper*:

> [T]his case . . . raises questions of the highest importance to the maintenance
> of our federal system of government. It necessarily involves a claim by the
> Governor and Legislature of a State that there is no duty on state officials
> to obey federal court orders resting on this Court's considered interpretation
> of the [U.S.] Constitution. Specifically, it involves actions by the Governor
> and Legislature of Arkansas upon the premise that they are not bound by
> our holding in *Brown v. Board of Education*, 347 U.S. 483 . . . We reject
> these contentions.

*Cooper*, 358 U.S. at 4.

*Cooper* evidences the Supreme Court's rejection of the assumption that Arkansas
could alter the force or effect of federal court decisions and federal court orders by

---

[5]     Amendment 44 was put to a second vote in the 1990 general election and was
repealed, barely. *See* ARKANSAS SECRETARY OF STATE, ARKANSAS ELECTION RESULTS
1990, https://www.sos.arkansas.gov/uploads/elections/1990_Election_results.pdf, at 77.
(50.96% for repeal, 49.04% for retention). It is worth noting that the vote in Lafayette
County, the home of LCSD, was in favor of retention of Amendment 44: 1,214 (52.8%)
for retention, 1,086 (47.2%) against. *Id.*

constitutional amendment, statute, or policy. Sixty years later, the same result must be obtained.

The 2017 Act can reasonably be interpreted as the Legislature's attempt to create law that would either require previously exempt districts to participate despite their desegregation obligations or at the very least make it so difficult to obtain an exemption that those districts would elect not to request an exemption. The 2017 Act, and the recent decisions of the SBE and the ADE, are predicated on the assumption that only desegregation orders that are "explicit" and include the term "inter-district" in addressing student transfers are valid. Nothing could be further from the truth, and the State should not be allowed to pretend that this is so. The Arkansas General Assembly cannot through the 2017 Act vest the ADE with authority to interpret federal court desegregation orders. Nor can the General Assembly undermine federal court authority and orders by inserting restrictions such as "explicitly" and "inter-district" where they do not appear, and in ways that would undermine the ability of the parties to comply with their constitutional obligations. The General Assembly's actions in drafting the 2017 Act are nothing more than a thinly veiled attempt to feign compliance with *Cooper* by giving the appearance that they are "obeying" or giving deference to federal court orders all the while placing additional requirements on the desegregation mandate not contained in the language of those orders.

The current posture of this case presents a situation that, if not corrected, will set Arkansas back on a path that was constitutionally bankrupt and exposed the state and its people to a justifiable national judgment that the state harbored little if any respect for the Constitution. LCSD respectfully requests that this Court issue an order declaring that the

portions of the 2017 Act granting the ADE authority to evaluate LCSD's desegregation orders and determine whether or not a conflict exists between them and participation in school choice are unconstitutional and that the SBE's March 28, 2018 Order requiring LCSD to participate in school choice is void.

### III.   LCSD has a Conflict with Participating in School Choice Based on the 1993 *Turner* Decree, the Findings of this Court in *Kemp*, and the Segregative Impact Participation would have in LCSD; Declaratory Relief is an Appropriate Remedy

#### A.   The 1993 *Turner* Decree Conflicts with Participation in School Choice

The 2017 Act, as codified at Ark. Code Ann. § 6-18-1906(a)(2), requires that a district claiming a conflict submit proof that it has "a genuine conflict under an active desegregation order . . . that explicitly limits the transfer of students between school districts." LCSD submitted the 1993 *Turner* Decree and this Court's August 31, 2016 Order in the El Dorado School District ("EDSD") desegregation case, *Kemp v. Beasley*. (*See* Exhibit 11, LCSD's December 27, 2017 Letter; *see also*, Exhibit 1, 1993 *Turner* Decree; Exhibit 12, EDSD Order). As noted *supra* Section I, LCSD believes the 1993 *Turner* Decree is still an "active desegregation order" to which it remains subject.

The 1993 *Turner* Decree does not address inter-district student transfers. (*See* Exhibit 1, 1993 *Turner* Decree). It does address, however, the parties' intent to prevent LCSD from "engaging in any policies, practices, customs or usages of racial discrimination in any school operation including . . . student assignments." (*See* Exhibit 1, 1993 *Turner* Decree, ¶ 4). This language is interpreted by LCSD to mean it has an obligation not to participate in student assignment programs, such as school choice, when it is clear that

discrimination based upon race is a factor in student transfers, and when the result of participation will be a segregative impact in LCSD.

Despite the language of the 2017 Act regarding "inter-district" transfers, for purposes of determining conflicts with the school choice acts, LCSD believes the distinction between the intra-district and inter-district origins of a particular case is not dispositive; instead, LCSD believes the operative question is whether participation in school choice would have a segregative impact on a district with intra-district desegregation obligations based on its demographics and those of the districts surrounding it.

The 1993 *Turner* Decree speaks globally of "promot[ing] pupil . . . integration rather than . . . passive acceptance of desegregation between students of all races." (*See* Exhibit 1, 1993 *Turner* Decree, ¶ 12). The 1993 *Turner* Decree should be read in the clear light of the history of choice in Arkansas and the facts that prompted, and continue to keep alive, this litigation. Careful attention to the history and context establishes in no uncertain terms that the intent of the order was to bar LCSD from taking any and all actions that facilitated or allowed discrimination based upon race. Requiring LCSD to participate in school choice equates to requiring it to adopt a student assignment plan that will have a discriminatory, segregative impact in LCSD.

LCSD believes that participation in school choice conflicts with the 1993 *Turner* Decree, not only based on the text of that document, but also because participating in school choice would destroy or impede its ability to attain full unitary status and release from court supervision consistent with its obligations to do so under the longstanding, clear, and consistent commands of the operative decisions of this Court, the United States Court of

Appeals for the Eighth Circuit, and the Supreme Court of the United States. *See generally Brown I*, 347 U.S. 483; *Brown II*, 349 U.S. 294; *Cooper*, 358 U.S. 1; *Raney v. Board of Ed. of Gould, Ark. School Dist.,* 391 U.S. 443 (1968); *Milliken v. Bradley*, 418 U.S. 717 (1974).

### B.   LCSD is Demographically Similar to EDSD, which the ADE Declared Exempt from Participating in School Choice

In *Kemp*, this Court found that EDSD "has a continuing constitutional obligation to avoid taking any action the natural and probable consequence of which would be a segregative impact in EDSD" and that participation in school choice, since it would allow inter-district movement, "would have a segregative impact in EDSD." (*See* Exhibit 12, EDSD's August 31, 2016 Order, ¶¶ 8-9, hereafter "EDSD Order"). The EDSD Order advances the proposition that high probability of inter-district white flight also violates a desegregation order initially imposing an intra-district remedy for racial segregation.

LCSD believes it also has a continuing constitutional obligation "to avoid taking any action the natural and probable consequence of which would be a segregative impact" in LCSD. LCSD's black enrollment (61.1%) is substantially higher than both Spring Hill's (1.0% black enrollment) and ETBSD's (16.1% black enrollment district-wide, 3.7% black enrollment in Taylor). LCSD believes it has a continuing constitutional obligation to prevent its schools from becoming more racially identifiable. This obligation is derived from the teaching of *LRSD, et al. v. PCSSD, et al.*, No. 4:82-cv-866, U.S. Dist. Ct., E.D. Ark., Western Div. There, State action that promoted voluntary movement of whites from a school district with an intra-district desegregation order to another district, thereby causing segregation in the former district, was unconstitutional. *See, e.g., LRSD v. PCSSD*, 778 F.2d at 428 (noting that "plaintiffs introduced substantial evidence demonstrating that

16

a 'disproportionate' number of whites . . . left LRSD or moved into PCSSD instead of LRSD upon moving from other areas and that substantially more blacks moved into LRSD than would otherwise have done so in the absence of defendants' discriminatory actions and the resulting racial turmoil in LRSD").

LCSD is similarly situated to EDSD demographically. EDSD's black student population is near 50%, while LCSD's is 61.1%. LCSD, also like EDSD, has a substantially higher black student population than its neighboring districts.[6] In 2017-18, Spring Hill had a black student enrollment percentage of 1.0% and the Taylor schools in ETBSD had a black student enrollment percentage of 3.7%; EDSD's neighbors had black student percentages of 10.1% (Parkers Chapel) and 17.6% (Smackover). If participation in school

---

[6]     The fact that LCSD (and EDSD and other similarly situated districts) has a black student population that far exceeds the black enrollment of neighboring districts illustrates that "all vestiges" of segregation formerly required by law have not been eliminated. The "existing conditions" within LCSD that are traceable to state-mandated segregation of students go back to the years in which the state did not require that black children attend a school located in their communities. Because the smaller, rural schools had either inadequate schools for black students or no black schools at all, it most often fell to the county seat school district to educate the county's black children. Schools like Spring Hill likely do not have a substantial black student population today because black students left – or never lived in – those areas due to the inadequacy of the black schools. (*See*, for example, *LRSD v. PCSSD*, 778 F.2d 404, 412 and fn 6 (8th Cir. 1985), noting black students' migration out of Pulaski County and into Little Rock School District "to attend senior high in Little Rock from the 1920s to the 1960s. They probably became numerous in the early 1930s when Paul Laurance Dunbar High School acted as a magnet for county students who had little opportunity to attend senior high in their own district."). As in Little Rock, black students residing in south and central Arkansas historically migrated to schools such as those now known as Camden Fairview School District ("CFSD"), EDSD, Hope School District, Hot Springs School District ("Hot Springs"), LCSD, and other "county seat" school districts, either because their area did not have a black school or the one they had was inadequate. Decisions approving the construction of public housing in Lewisville and Stamps (and the absence of public housing in the smaller, more rural districts) also contributes to the county seat districts being racially identifiably "blacker" than the racially identifiably "whiter" districts they border.

choice – by allowing inter-district movement between EDSD and Parkers Chapel or Smackover – has a segregative impact in EDSD, it must also follow that participation in school choice – and the allowance of inter-district movement between LCSD and Spring Hill, ETBSD, or other "whiter" districts bordering LCSD – has a segregative impact in LCSD.

### C. The Result of Participation in School Choice is a Segregative Impact in LCSD

As previously noted, LCSD neighbors Spring Hill (1.0% black enrollment), and ETBSD (16.1% black enrollment district-wide, 3.7% in the Taylor schools), both of which have virtually no black students as compared to LCSD (61.1% black enrollment).[7] LCSD's position is that any time demographic differences such as these exist, i.e. a district with a substantially higher percentage of black students bordered by districts with virtually no black students, the result of the "blacker" district's participation in free and unrestricted school choice will be white flight.[8]

---

[7]     The data presented by LCSD are consistent with a recently released national study, which found that "in Arkansas . . . more than 15 percent of schools have substantially higher shares of black students compared to what the surrounding neighborhood would indicate." Grover J. Whitehurst et al., Balancing Act: Schools, Neighborhoods and Racial Imbalance, p. 2 (Brookings Institution, November, 2017). That report characterizes Arkansas as one of the most segregated, or least desegregated states "in terms of racial imbalance." *Id.* at 24.

[8]     School choice participation records maintained by the ADE evidence disproportionately non-black participation in school choice in the State as a whole. The ADE's data show that 14,123 Arkansas students received a school choice transfer in 2017-18. Of those, 13,048 students (92.4%) identified as non-black and 11,806 students (84%) specifically identified as white. Only 1,075 students (7.6%) who obtained school choice transfers identified as black. Total enrollment in the state stands at 479,258 students, of which 96,886 (20.2%) are black and 382,372 (79.8%) are non-black, with 292,716 (61.1%) specifically identifying as white.

Requiring LCSD to participate in school choice will result in white parents seeking transfers to Spring Hill, ETBSD, or other districts with fewer black students than LCSD. This contention is supported by the applications LCSD has received as of the date of this filing. (*See* Exhibit 19, Spring Hill School Choice Applications; Exhibit 21, ETBSD School Choice Applications; Exhibit 23, Magnolia School Choice Applications). LCSD has received 15 school choice applications requesting transfer to Spring Hill, 24 school choice applications requesting transfer to ETBSD, and three school choice applications to Magnolia School District. Excluding duplicates, these applicants total 42 students, all of whom are non-black and specifically identify as white. In other words, all of these transfers would reflect segregative movement from a "blacker" district to a "whiter" district.

The orders entered in *Turner* obligated LCSD to "eliminate from the [LCSD] public schools all vestiges of state-imposed segregation." *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15 (1971). The practices to be avoided included both "roots" and "branches." *Green v. County School Board of New Kent County*, 391 U.S. 430, 438 (1968). That is, it was not enough for either Arkansas or LCSD to simply eliminate state constitutional and statutory commands that created and maintained segregated schools. It was also necessary to end then, and avoid in the future, any collateral practices whose "natural and foreseeable consequence[s]," *Penick*, 443 U.S. at 464, are to prevent the attainment of desegregated, integrated schools. As both the Supreme Court and the federal district courts have made abundantly clear, school choice in Arkansas can be one such "branch" and "practice." *See Raney*, 391 U.S. at 447; *see also*, Exhibit 12, EDSD Order, ¶¶ 8-9 (school choice under the 2015 Arkansas Public School Choice Act would have "the natural and probable consequence" of "a segregative impact" on EDSD).

The segregative impact that will be caused by LCSD's participation in the 2015 Act, as amended by the 2017 Act, is also evidenced by the school choice transfer requests LCSD received in 2013-14, before it declared an exemption with participation in school choice under the 2013 Act and a conflict with participation under the 2015 Act. In 2013, LCSD – believing school choice participation would not adversely impact its efforts to comply with its desegregation obligations – did not contest Spring Hill's approval of 18 school choice applications, ETBSD's (then-Emerson-Taylor School District) approval of 12 applications, Nevada School District's approval of three applications, or Magnolia School District's approval of one application. Of the 30 total applicants excluding duplicates, all identified as non-black and all specifically identified as white.[9] (*See* Exhibit 8, 2013-14 School Choice Applications).

The "natural and probable consequence" of LCSD's participation in the 2015 Act, as amended by the 2017 Act, would be the same segregative effect as the inter-district movement of students that occurred as a result of LCSD's participation in school choice in 2013-14 under the 2013 Act because the same circumstances continue to exist. The 30 school choice transfers allowed in 2013-14 – all non-black – were segregative, and the 42 school choice transfer applications LCSD has received for 2018-19 – again, all non-black – are equally segregative.

LCSD's obligation to avoid action or inaction that results in a segregative impact to LCSD conflicts with participation in school choice. In turn, the SBE's decision to require LCSD to participate in school choice violates the orders entered by this Court in *Turner*.

---

[9]     One applicant submitted two applications, the first of which listed his race as white, while the second listed his race as Hispanic. (*See* Exhibit 8, pp. 2-3).

The SBE's action requiring LCSD to participate in school choice would reverse a lifetime of no movement across district lines and replace it with free movement across district lines. LCSD is prepared to present evidence that this would have a substantial segregative impact within LCSD. There is no indication that the ADE evaluated the segregative impact school choice transfers will have prior to issuing its January 19, 2018 decision. Nor is there any indication that the SBE considered the demographic information provided to them at the March 8, 2018 meeting or the testimony of LCSD School Board President Lindsay Nutt or Superintendent Robert Edwards that race was a motivator for these transfers and white flight would undoubtedly result from LCSD's participation in school choice. (*See* Exhibit 15, Transcript of March 8, 2018 SBE meeting, p. 120 (School Board President Lindsay Nutt, noting "[t]he hateful and racial words that have come out of these parents' mouths about why they want to move their children," and asking the SBE to understand why the LCSD board requested an exemption, "because we know the ramifications – we have suffered them and we have lived with them for years; to be able to let us make our own decision, approve our exemption, and let us educate our children, knowing what past history has shown for our community."); id. at p. 121 (Superintendent Robert Edwards, attesting to his experience with parents who desire to transfer their children from LCSD, and when asked why, have stated 'Mr. Edwards, I don't want my boys being the only white left in their grade' and 'Mr. Edwards, you know the reason; there's no need to ask me.'")).

LCSD respectfully requests that this Court issue an order declaring that LCSD has a conflict with participating in school choice under the 2015 Act, as amended by the 2017 Act, and that the SBE's March 28, 2018 Order requiring LCSD to participate in school choice is void.

**IV.     LCSD Requests Clarification of Its Orders to Reflect that Segregative Inter-District Transfers are Prohibited**

The 1993 *Turner* Decree evidences both the original parties' and the Court's concern regarding segregative or discriminatory student assignment. The intra-district nature of the case does not render segregative transfers to Spring Hill or ETBSD (or any other district) constitutional simply because the magic words "inter-district transfer" are not included in the 1993 *Turner* Order. The Pulaski County desegregation case is analogous. When the settlement of that case was approved *circa* 1989, restrictions on inter-district transfers were put in place between the three party school district defendants – LRSD, PCSSD, and NLRSD. Other districts were not included. White flight from, for example, LRSD to Cabot or Bryant, was prohibited by other laws in effect at the time, namely the 1989 Act. It is important to interpret the decrees in light of the other safeguards in place when they were negotiated.

It is also worth noting that the single commonality between the six districts (or three, if you count the Garland County districts collectively as one) that did receive exemptions from the ADE is that federal court orders have been entered in each of their respective cases since the 2013 Act was enacted.[10] In the EDSD and Jacksonville-North Pulaski cases the SBE simply ignored older desegregation orders and granted a transfer anyway, forcing the districts to challenge that transfer in federal court. The consent order in Garland County was challenged directly in federal district court but withstood the

---

[10]     Those orders specifically found that those districts have a conflict with participating (EDSD), are permitted to exempt from participating (JNPSD), or should continue following the inter-district transfer provisions of their desegregation orders, which creates a conflict with participating (the Garland County districts, whose settlement agreement incorporated the 1989 Act as the mechanism to be used when considering inter-district transfers).

challenge, resulting in a new federal district court order, which was appealed to the Eighth Circuit and affirmed. The reality is that the ADE, and in turn the SBE, is not giving credence to desegregation orders until forced to, which lends further weight to LCSD's argument that it needs relief from this Court and clarification of previous orders (or declaratory relief or modification of previous orders).

If the intent of the parties at the time the 1993 *Turner* Decree was entered was to prohibit segregative and discriminatory student assignment, then that intent should be considered and the orders clarified based on the changes in the law that have transpired since 1993, most notably the 2013 repeal of the 1989 Act and the passage of the 2013 Act, 2015 Act, and 2017 Act.

LCSD respectfully requests that this Court issue an order clarifying the previous orders entered in *Turner* to reflect that LCSD has a conflict with participating in school choice under the 2015 Act as amended by the 2017 Act and that segregative inter-district transfers are prohibited unless requested for educational or compassionate purposes and approved by LCSD's board. LCSD also again requests that this Court void the SBE's March 28, 2018 Order requiring LCSD to participate in school choice.

### V.    LCSD Requests Modification of Its Orders in Light of the Repeal of the 1989 Act

Modification of a consent decree is appropriate following "a significant change either in factual conditions or in law" and "when enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384; *see also Horne*, 557 U.S. at 447. The *Rufo* Court specifically noted that because decrees entered in institutional reform litigation "often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased." *Rufo*,

502 U.S. at 380, citing *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114, 1119-1121 (CA3 1979), cert. denied, 444 U.S. 1026 (1980) ("in which modification of a consent decree was allowed in light of changes in circumstances that were beyond the defendants' control and were not contemplated by the court or the parties when the decree was entered."). *Id*.

The 1989 Act was in effect at the time the 1993 *Turner* Decree was negotiated by the parties and approved by the Court. The racial restrictions on transfers that were included in the 1989 Act (at the time agreements were made in the *Turner* case) eliminated the need to include express language to that effect in the settlement agreements or consent decrees. From entry of the 1993 *Turner* Decree through the 2013 legislative session, LCSD was able to rely on the restrictions articulated in the 1989 Act as a means of preventing private choice from interfering with its efforts to desegregate. That safeguard has been repealed. Successive statutes have in turn retreated from a system where choice was limited in recognition of the need to avoid promoting white flight, to one within which the only protections afforded are for those districts subject to federal court desegregation orders or decrees. Both the original context within which the Decree was fashioned and the subsequent changes in the statutory landscape matter:

> [E]ven when interpreting the meaning of a consent decree "as written," we are not to ignore the context in which the parties were operating, nor the circumstances surrounding the order. [*United States v. ITT Continental Baking Co.*, 420 U.S. 223, 243 (1975)]. This is because a consent decree is a "peculiar sort of legal instrument that cannot be read in a vacuum. It is a kind of private law, agreed to by the parties and given shape over time through interpretation by the court that entered it."

*United States v. Knote*, 29 F.3d 1297,1300 (8th Cir. 1994) (quoting *Sennewald v. University of Minnesota*, 847 F.2d 472, 475 (8th Cir. 1988) (Arnold, J., concurring)).[11] A consent decree is both a legal settlement and a type of contract. *See Firefighters*, 478 U.S. at 519 ("because their terms are arrived at through mutual agreement of the parties, consent decrees . . . closely resemble contracts"). Assessing and enforcing such decrees, in turn, involves "applying the terms of a contract between the parties to the facts that have arisen since its creation." *Little Rock School District v. Pulaski County Special School District No. 1*, 83 F.3d 1013, 1017 (8th Cir. 1996).

Modification of the 1993 *Turner* Decree is appropriate to address the change in law caused by the repeal of the 1989 Act and the passage of the 2013 Act, 2015 Act, and 2017 Act and enable LCSD to continue to comply with its constitutional obligations to avoid any action the natural and foreseeable consequence of which is a segregative impact within LCSD. Additionally, it is detrimental to the public interest to allow an inter-district student transfer program to create segregation or further the racial divide between school districts to the extent that the districts become racially identifiable, i.e. one school district is charged with educating almost all of the area's black students while neighboring districts have virtually zero black students. The 1989 Act was and remains the only choice measure enacted that articulated the clear principle that choice transfers that facilitate integration were to be encouraged and those that promoted segregation were to be barred. That

---

[11]    Indeed, the ADE took precisely that position in the wake of the SBE's approval of an impermissible choice transfer from JNPSD to the Cabot School District. *See Little Rock School District v. Pulaski County Special School District*, No. 4:82-cv-866, Doc. 5231, p. 7 ("The intent of the parties must be taken from the whole context of the agreement, not from particular words and phrases in isolation.") (citing and quoting *Wal-Mart Stores, Inc. v. Coughlin*, 369 Ark. 365, 371 (2007), and Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 167 (West 2012)).

principle should not have been abandoned, and this Court should not countenance decisions and measures that render it a nullity.

Students and parents in Arkansas have an overarching federal "constitutional right . . . to attend a unitary school system." *Milliken*, 418 U.S. at 746. The State, through the ADE and the SBE, has an obligation not to approve or facilitate state policies that have the purpose or effect of creating, maintaining, or increasing school districts or school attendance zones that are racially identifiable. *See LRSD v. PCSSD*, 778 F.2d 404, 428 (8th Cir. 1985). Prior to 2013, state law recognized this obligation by prohibiting segregative transfers. The State's shift from enacting laws that prohibited segregation and encouraged integrative transfers to advocating for school choice above all else, including desegregation efforts, is another important change in circumstance justifying modification.

For these reasons, LCSD respectfully requests that this Court modify the orders previously entered in *Turner* to reflect the repeal of the 1989 Act and LCSD's conflict with participating in school choice under the 2015 Act as amended by the 2017 Act, and that this Court void the SBE's March 28, 2018 Order requiring LCSD to participate in school choice.

## CONCLUSION AND RELIEF REQUESTED

The Arkansas Legislature continues to amend the portion of the law regarding desegregation conflicts. The only possible reason for their continued revisions is to make it more difficult for districts to exempt from participating. It is plainly unconstitutional for the State to substitute itself or its agencies for the federal courts. It is also unconstitutional for the State to require districts to participate without considering the segregative impact the resulting transfers would have. There is no evidence from the ADE's letter or the SBE's

discussion during the March 8, 2018 meeting that either entity considered the segregative impact participation in school choice would have on LCSD. The facts presented by LCSD here make it clear that it is the policy and goal of the state to promote school choice above all else. LCSD does not believe that school choice as a concept is wrong in the abstract. It is, rather, the extent to which school choice facilitates "white flight and consequent resegregation." *Clark v. LRSD*, 705 F.2d 265, 271 (8th Cir. 1983) (specifically noting that "the possibility of white flight and consequent resegregation . . . may be taken into account in an attempt to promote integration").

The State has given "school choice" a prime position regardless of its consequences. That is an unwise policy in a state where the data demonstrate that there are in fact substantial present effects of past invidious discrimination in the structure and delivery of K-12 education. It is more than unwise in the case of districts subject to federal court orders and decrees designed to facilitate desegregation and promote integration. It is blatantly unconstitutional. LCSD respectfully requests that this Court grant the relief requested.

Respectfully submitted,

Allen P. Roberts (64036)
Allen P. Roberts, P.A.
325 Jefferson St., S.W. P.O. Box 280
Camden, Arkansas 71711-0280
Phone: (870) 836-5310
Facsimile: (870) 836-9662
Email: allen@aprobertslaw.com

and

Whitney F. Moore (2009193)
Allen P. Roberts, P.A. – Little Rock Office
1818 N. Taylor, St., Suite B
PMB 356
Little Rock, AR 72207
Telephone: (870) 818-5490
Fax: (870) 836-9662
Email: whitney@aprobertslaw.com

By:   **/s/ Whitney F. Moore**
Whitney F. Moore

Attorneys for Lafayette County School District

## CERTIFICATE OF SERVICE

I, Whitney F. Moore, do hereby certify that on May 18, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to:

All counsel of record

**/s/ Whitney F. Moore**
Whitney F. Moore