IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

**MARY TURNER,** *et al.*

PLAINTIFFS

v.   No. 4:92-cv-04040-SOH

**LEWISVILLE SCHOOL DISTRICT,** *et al.*   DEFENDANTS

BRIEF IN SUPPORT OF MOTION TO INTERVENE AND
DECLARE LAFAYETTE COUNTY SCHOOL DISTRICT UNITARY

Federal courts have limited authority over schools. Education policy is generally left up to the States. Courts may only step in and manage districts when necessary to stamp out *de jure* segregation.

It's no longer necessary for this Court to supervise the Lafayette County School District. That district has fully complied with a consent decree for thirty years—with no complaints. And it has no intention of backsliding. Besides, reading the decree to require more than nondiscrimination would pose constitutional problems. Thus, this Court should terminate its jurisdiction over Lafayette. And because that district has not yet sought termination, this Court should let the Arkansas Department of Education and State Board of Education intervene and seek it themselves.

## I.   Background

Three decades ago, black students and teachers charged the Lewisville School District with race discrimination. To settle their claims, the District entered a consent decree promising not to discriminate in any of its operations, including "faculty assignments [and] student assignments." Doc. 27-1 ¶ 4. Among other things, the District agreed to implement fair promotion criteria, prioritize hiring black staff, and reexamine its policies for kindergarten retention. *Id.* ¶¶ 4-6, 17.

Aside from a pro forma motion to change the District's name from Lewisville to Lafayette, this case lay dormant until 2018. That year, Lafayette invoked the consent decree in an attempt to get out of Arkansas's interdistrict school-choice program. Doc. 27. Lafayette asserted that allowing school choice would produce *de facto* resegregation. *Id.* ¶ 9. But it did not claim any current problems with race discrimination. To the contrary, Lafayette's then-superintendent testified at a preliminary-injunction hearing that Lafayette was unitary in all respects. *See* Ex. A. And he confirmed that Lafayette has no intention of discriminating against its black students. *Id.*

The Eighth Circuit rejected Lafayette's school-choice argument. *United States v. Junction City Sch. Dist.*, 14 F.4th 658, 666 (8th Cir. 2021) (explaining that Lafayette's consent decree had "nothing to do with interdistrict school transfers"). And in doing so, it raised red flags about Lafayette's consent decree "continuing in place." *Id.* at 668. Because no party had invoked the consent decree for decades, it was "unclear" to that court whether "there [was] any reason for the continued federal oversight." *Id.* Conversely, it acknowledged that leaving the decree in place would needlessly frustrate valid state policies. *Id.* at 667-68.

To free Arkansas policymakers from this "overbroad" and "outdated" consent decree, the Eighth Circuit suggested that this Court should move forward and "hold a unitary status hearing and consider removing the[] case[] from the federal docket." *Id.* Recently, Lafayette told the Department of Education that the District would propose seeking unitary status to the school board at its September 2022 meeting. *See* September 2022 Compliance Letter, Ex. B at 2. But the school board did not decide whether to do so at that meeting, and apparently did not commit to a time frame for making that decision. *See* Board Minutes, Ex. C (noting ambiguously that the board would consider unitary status "later"); December 2022 Compliance Letter, Ex. D (providing no additional information).

2

The State reached out to Lafayette's counsel about ending judicial supervision shortly after the Eighth Circuit's decision, then again this February and March. *See* Letter to Counsel, Ex. E. On the understanding that Lafayette would move for termination in the "very near future," the State offered its assistance. *Id.* The District has not yet acted.

## II. The State May Intervene to Defend Its Interests in Education Policy

Arkansas's Department of Education and Board of Education are entitled to intervene in any case that might "impede [their] ability to protect [their] interest[s]" if "existing parties" do not "adequately represent that interest." Fed. R. Civ. P. 24(a)(2). This case checks both boxes. The State must ensure that Arkansas's students receive a constitutionally adequate education. *See Lakeview Sch. Dist. No. 25 of Phillips Cnty. v. Huckabee*, 91 S.W.3d 472 (Ark. 2002). Indeed, the State is constitutionally obligated to maintain a "general, suitable and efficient system of public schools." Ark. Const. art. 14, sec. 1. And the State can't be sure that school districts will adequately represent its sovereign interests.

*1. The State's Interests.* Though the State has delegated some power over education policy to school districts, it retains the ultimate authority. *See* Ark. Code Ann. 6-11-105(a)(1) (confirming that the State Board of Education has "general supervision of the public schools of the state"). Consent decrees like Lafayette's interfere with the State's authority by bringing in a third party: federal courts. Court supervision over schools was an extraordinary remedy necessary to overcome state-sponsored segregation. *See Freeman v. Pitts*, 503 U.S. 467, 503-05 (1992) (Scalia, J., concurring) (tracing the history of desegregation remedies). Still, ongoing judicial supervision raises acute "federalism concerns." *Horne v. Flores*, 557 U.S. 433, 448 (2009). Our constitutional structure ordinarily leaves education policy in the hands of state policymakers, not federal judges. *Id.*

For good reason: "[w]hen the school district and all state entities participating with it in operating the schools [may] make decisions in the absence of judicial supervision," they are more "accountable to the citizenry" and "the political process." *Freeman*, 503 U.S. at 490 (majority op.).  Conversely, ongoing judicial supervision "bind[s] state and local officials to the policy preferences of their predecessors" and "deprive[s] future officials of their designated legislative and executive powers." *Horne*, 557 U.S. at 449 (internal quotation marks omitted).  Thus, the Supreme Court has urged judges to "promptly" return authority to the State "when the circumstances warrant." *Id.* at 450; *accord Freeman*, 503 U.S. at 490 ("Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system.").

And because consent decrees interfere with Arkansas's education policies, state law urges schools to seek termination as soon as possible.  Districts are required to keep the State apprised of any desegregation-related orders.  Ark. Code Ann. 6-13-113; Rules Governing Standards for Accreditation of Arkansas Public Schools and School Districts, Standard 3-A.10 (2020).[1]  And they must submit "detailed plan[s]" for "obtaining full unitary status and release from court supervision." *Id.* Standard 3-A.10.1. If the State suspects that a district is not actually following its unitary-status plan, it may put the district on "Probation." *Id.* Standard 3-A.10.2.

*2. Inadequate Representation.*  The State cannot always count on the districts to "represent [its] interest[s]."  Fed. R. Civ. P. 24(a)(2).  School districts may be content to remain under federal supervision. *Horne*, 557 U.S. at 448-49; *Junction City*, 14 F.4th at 667.  Lafayette's invocation of the consent decree to avoid participating in school choice illustrates as much.  The District recognized that it was unitary in all respects.  Ex. A.  Yet rather than seek to free itself of judicial

---

[1] https://adecm.ade.arkansas.gov/Attachments/Standards_for_Accreditation_(Effective_7-1-20)_155605.pdf (last visited Dec. 15, 2022).

oversight, it "sought to expand the consent decrees (and concomitantly expand federal oversight) to a whole new arena of school operations." *Junction City*, 14 F.4th at 668. Thus, to ensure that a party to the case represents its sovereign interests, the State must itself step in.

### III. Lafayette Has Complied with the Consent Decree for Three Decades

Lafayette's consent decree aimed to prevent "racial discrimination in any school operation including . . . faculty assignments, student assignments, and the treatment of [minority] pupils within the school system." Doc. 27-1 ¶ 4. Lafayette has "complied in good faith with [this] decree since it was entered" and has eliminated "the vestiges of past discrimination . . . to the extent practicable." *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995) (internal quotation marks and alterations in original omitted); *see also Green v. Cty. Sch. Bd. of New Kent Cty.*, 391 U.S. 430, 435 (1968) (instructing courts to examine a formerly segregated school's "faculty, staff, transportation, extracurricular activities and facilities"). Indeed, as Lafayette has acknowledged, it is unitary in every aspect addressed by the consent decree. Ex. D at 2.

Start with those portions of the consent decree targeting Lafayette's treatment of its black students. The consent decree obligated Lafayette to adopt an "affirmative inclusion policy"—that is, Lafayette had to affirmatively promote integration, rather than passively wait for desegregation. Doc. 27-1 ¶¶ 12-13. That meant working to reduce disproportionate placements of black students in special education, *id.* ¶¶ 10-11, integrating "gifted and talented classes, advanced placement classes, the cheerleaders, basketball teams, Beta type clubs and referrals to Governor's school," *id.* ¶ 12, crafting new disciplinary policies that did not "adversely and disparately impact . . . black pupils," *id.* ¶ 14, and scrutinizing its kindergarten and first-grade retention policies to prevent racially disproportionate retentions, *id.* ¶ 17. Lafayette also agreed to conduct in-service training on teaching students from different racial and social-economic backgrounds. *Id.* ¶ 15.

5

Lafayette has fully complied: it "does not consider race when referring students for special education services, participation in school programs and activities, discipline, or retention." Ex. D at 2. And no student has invoked the consent decree to allege race discrimination since it was entered.

The consent decree also included several provisions regulating Lafayette's treatment of its black employees. It required Lafayette to develop and use "objective, nondiscriminatory, job-related employment criteria" when deciding who to hire or promote. Doc. 27-1 ¶ 5. If it wanted to use any other "subjective" criteria, it had to ensure that such criteria were "related to the job" and announced beforehand to ensure equal application to white and black applicants. *Id.* ¶ 6. It had to "post conspicuous notices" of any job opening, listing details about the position and hiring criteria. *Id.* ¶ 9. And it had to develop a uniform salary schedule to ensure fair compensation. *Id.* ¶ 5.

Lafayette also committed to prioritize "under-representation of black staff." *Id.* ¶ 5. It aimed to ensure that "[n]on-administrative positions," such as "coaches, departmental heads, [and] band directors," would be "racially representative." *Id.* ¶ 7. And it would "take affirmative steps to [e]nsure that black staff and faculty members [were] distributed throughout all course[s] and programs of the system." *Id.* ¶ 8.

Lafayette has complied with each of these requirements too. *See* Ex. D at 2 ("[Lafayette] believes it is currently in compliance with all of the provisions listed above" and "has equal employment opportunity policies."). Lafayette posts job openings on its website, and each posting lists the job's requirements. *See* Job Opportunities, *Lafayette County School District*.[2] It has developed comprehensive salary schedules. *See* Salary Schedules, *Lafayette County School*

---

[2] https://www.lcscougars.org/53321_1 (last visited Dec. 16, 2022).

*District*.³  It seeks to hire minorities.  *See* 2022-2023 Minority Teacher & Administrator Recruitment Plans.⁴  And both of its schools employ black and white employees at all levels.  *See* Ex. F (compiling data from the Arkansas Department of Education's My School Info website). Unsurprisingly, no party has alleged employment discrimination under the decree since it was entered.

Because Lafayette has indisputably complied with the consent decree for three decades, this Court should terminate that decree and declare Lafayette unitary.  *Junction City*, 14 F.4th at 668.

**IV.   Keeping the Consent Decree in Place Might Violate the Fourteenth Amendment**

This Court should terminate the consent decree for another reason: it may pose constitutional concerns.  Read most charitably, the consent decree aims to stop discrimination, and if that's the goal, the decree's work is done.  *See supra* Part III.  But the decree arguably requires more than nondiscrimination.  It aims to achieve racial proportionality between students and faculty, Doc. 27-1 ¶ 5, and within particular classes and programs, *id.* ¶¶ 11-12, 17.  And it instructs the District to take "affirmative" steps to "maximize[] bi-racial pupil and staff participation."  *Id.* ¶¶ 12-13.

Those "affirmative" steps are likely unconstitutional.  The Supreme Court has been clear that "[r]acial balance is not to be achieved for its own sake."  *Freeman*, 503 U.S. at 494.  Once *de jure* segregation is gone, any consideration of race is immediately suspect.  *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 725 n.12 (2007) (plurality opinion). Precedent leaves open the possibility that racial diversity *may* be a compelling interest satisfying

---

³ https://www.lcscougars.org/168106_2 (last visited Dec. 16, 2022).
⁴ https://www.lcscougars.org/589216_3 (last visited Dec. 16, 2022).

strict scrutiny in some circumstances—but that precedent is currently under reconsideration. *See id.* at 788-89 (Kennedy, J., concurring in part and concurring in judgment); *Students for Fair Admissions v. Univ. of N.C.*, No. 21-707 (U.S.); *Students for Fair Admissions v. President & Fellows of Harv. College*, No. 20-1199 (U.S.). And even if diversity writ large is a compelling interest, achieving racial proportionality is not. *See, e.g.*, *Regents of Calif. v. Bakke*, 438 U.S. 265, 308-09 (1978) (Powell, J., concurring); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 499 (1989) (plurality opinion). To the extent that the decree mandates that sort of proportionality, it must be terminated. *Cf. Bryant v. Woodall*, No. 1:16CV1368, 2022 WL 3465380, at *2 (M.D.N.C. Aug. 17, 2022) (terminating injunction that contradicts Supreme Court precedent because "[n]either this court, nor the public, nor [the parties] have the right to ignore the rule of law as determined by the Supreme Court").

## Conclusion

Lafayette has not been charged with discrimination for thirty years, so this Court does not need to continue supervising it. And were the school or plaintiffs to argue that nondiscrimination isn't good enough, this Court *couldn't* retain jurisdiction—it can't require the District to violate the Constitution. This Court should let Arkansas intervene and terminate the consent decree.

Dated: April 7, 2023

                              Respectfully Submitted,

                              TIM GRIFFIN
                              Arkansas Attorney General

                              */s/ Dylan L. Jacobs*
                              NICHOLAS J. BRONNI (Ark. Bar No. 2016097)
                                Arkansas Solicitor General
                              DYLAN L. JACOBS (Ark. Bar No. 2016167)
                                Deputy Solicitor General
                              HANNAH L. TEMPLIN (Ark. Bar No. 2021277)
                                Assistant Solicitor General
                              OFFICE OF THE ARKANSAS
                               ATTORNEY GENERAL
                              323 Center Street, Suite 200
                              Little Rock, AR 72201
                              Phone: (501) 682-3661
                              Fax: (501) 682-2591
                              Email: Nicholas.Bronni@arkansasag.gov
                                            Dylan.Jacobs@arkansasag.gov
                                            Hannah.Templin@arkansasag.gov

                              *Attorneys for Intervenors*